## Hollinshead *versus* Allen.

1. It is a principle of law, of logic, of philosophy, and of common sense, that in order to decide with accuracy upon the character of any phenomenon or transaction, we must know all the facts of which it consists, and all the circumstances that are truly connected with, and influence it.   This is essentially what is, in short, called the rule of the *res gesta*.

2. On the trial of an ejectment for the mortgaged premises, brought by purchasers at sheriff's sale, who were creditors of the assignor, when sold as the property of the assignor after a conveyance in trust which was alleged to have been fraudulent, the real estate book of the trustee relating to the mortgaged premises, and other real estate also conveyed to him in trust by the same grantor, is evidence against the daughter of the grantor to whom the trustee had conveyed the said premises and other real estate, before the sheriff's sale, to show, by the entries therein, that the trustee held the estate in trust.

3. The agreement under which the trust was created was also admissible in evidence to show the trust.

4. The voluntary declarations of a married woman that real estate claimed by her, as her own separate estate, was conveyed to her by her father in fraud of his creditors, are admissible in evidence on the part of the plaintiff, in an ejectment against her and her husband and her grantee.

5. Where an insolvent conceals property from his creditors, and afterwards has it conveyed to another who is informed of the fraud, such grantee cannot set up the discharge and insolvent assignment of the grantor against a creditor who has pursued the land, and purchased it at sheriff's sale; when sold as the property of the grantor on a claim existing against him at the time of his discharge.

FROM the Nisi Prius, *Philadelphia*.

This was an action of ejectment for a lot and wharf on Little Water street, Philadelphia, brought by Enoch Allen and Rebecca James *v.* Edmund J. and William Hollinshead, and Whitaker and wife in her right.   The plaintiffs claimed the premises as purchasers at sheriff's sale, when sold as the property of E. J. Hollinshead, and a deed by the sheriff to them, executed on the 21st February, 1846.

For a statement of the defendant's title, see the charge of his Honor, Judge ROGERS, delivered at Nisi Prius.

The agreement between E. J. Hollinshead and Jacob Ridgway, bears date on the 25th day of July, 1820.   It was stated therein, that Hollinshead had assigned to Ridgway four bonds and warrants of attorney, two of them accompanied by mortgages, also assigned, the whole amounting to $15,000.   That Hollinshead had given his note to Ridgway for $6000 ; that he had purchased from Ridgway a farm for $3000.   Hollinshead agreed to pay Ridgway for the land $3403, and it was stated he understood that the four bonds and the two mortgages, amounting in the whole to $15,000, were to remain in the hands of Ridgway, as collateral security; first, for the payment of the note for $6000, and further, for the payment of $1403, being one of the payments

on the land; on the payment of which Ridgway was to convey the land to Hollinshead, and take his bonds for the remaining $2000, with interest, &c.; and, whereas most or all of the bonds were in suit, Ridgway was to receive any moneys recovered on them, and after payment of the $6000 and the $1403, and the payment of costs, the surplus, if any, was to be paid to Hollinshead.

It was afterwards further agreed, that the bonds and warrants, and mortgages were to remain as a further collateral security for the payment of $3000, lent that day by Ridgway to Hollinshead; Ridgway to have the right to collect any money due on the securities, or sell them, or any part of them, and to account for any surplus.

Ridgway purchased the premises in dispute when sold under one of the mortgages, for $1090, and received a deed from the sheriff, dated 19th February, 1822. On the 1st of March, 1835, he conveyed the premises to Sarah E. Hollinshead, and on the 9th May, 1838, Sarah conveyed the premises to her father, E. J. Hollinshead, in trust for her brother William and herself.

On the trial the real estate book of Jacob Ridgway was given in evidence, on the part of the *plaintiffs*.

The deposition of Ann McCartney was also given in evidence on their part, to prove declarations made by the said Sarah, then the wife of Whitaker, to the effect that her father, E. J. Hollinshead, had assigned his property to her to keep it from his creditors.

The account book of Ridgway contained entries as to land taken from other real estate in New Jersey, under the direction of Ridgway, amounting to about $18,000. In this estate E. J. Hollinshead had an estate for life, as tenant by curtesy; the fee eventually became vested exclusively in Sarah. Her brother, who was born before her, died in his minority.

E. J. Hollinshead executed an assignment, as an insolvent, on the 9th April, 1822; and he was discharged on the 12th April, 1822. His petition as an insolvent was presented on March 23, 1822. It contained a statement of debts exceeding $15,000, including a claim, exceeding $1600, in favor of John Nagle, at whose suit the premises in dispute were afterwards, viz., in 1846, sold at sheriff's sale. Judgments for some of the debts were afterwards obtained, and some of them were in force at the time of this suit.

The charge of his Honor, Judge ROGERS, was, in part, as follows:—

"This is an action of ejectment to recover a lot and wharf in Little Water street, between Lombard and South, fronting the river Delaware. The plaintiff's title is briefly this:—The 29th March, 1828, John Nagle obtained a judgment against Edmund J. Hollinshead, the original defendant in the action, for a debt,

[Hollinshead *v.* Allen.]

owing to him by Hollinshead, and whether as surety or principal, is immaterial. This judgment was suffered to sleep until some time in the year 1842, when it was revived by *scire facias*. A *venditioni exponas* being issued on this judgment, after its revival, the property in dispute was sold by the sheriff, and purchased by the plaintiffs, Enoch Allen and Rebecca James, who were creditors of Hollinshead, to whom the sheriff, the 21st February, 1846, in due form executed a deed.

" The plaintiffs allege, that at the time the judgment was rendered, and at the time of its revival and sale, the property belonged to Edmund J. Hollinshead, as whose property it was seized and sold in payment of the debts. If you should be satisfied that at the time of the revival of the judgment the property in dispute belonged to Hollinshead, the plaintiff is entitled to recover. I say in 1842, the time the judgment was revived, because the plaintiff having omitted to revive his judgment, by issuing a *scire facias*, as prescribed by law, it had lost its lien, and, consequently, the lien only attaches from the time of its revival. This is the important part of time to which your attention will be particularly directed. The plaintiff, you will recollect, alleges, that at that time Hollinshead was the owner of the property in dispute. This the defendants strenuously deny, and this is the turning point of the cause.

" The defendants' title is this :—It is admitted, that on the 16th May, 1818, and before, the title to the property in dispute was vested in a certain Joshua Pedell, who on that day, viz., the 16th May, 1818, mortgaged the premises to secure the payment of $2000 to Joshua Ball. Ball assigned his interest in the mortgage to Edmund J. Hollinshead, who, on the 25th July, 1820, assigned the same to Jacob Ridgway. Proceedings were had on the mortgage, which resulted in the sale of the property to Jacob Ridgway, for the sum of $1090, who received in his own name a deed from the sheriff on the 19th February, 1822.

" The assignment of the Pedell mortgage, together with another mortgage, and two obligations, amounting to $15,000, as appears by an article of agreement, of even date with the assignment, was designed as collateral security for a debt of $6000, and also to secure the payment of purchase-money for a tract of land sold by Ridgway to Hollinshead, amounting to $3403, making $9403. The assignment of the Pedell mortgage, with the other assignments, were made the 20th July, 1820. At that time, as has been truly said by the defendant's counsel, Hollinshead was not the owner of the property in dispute. The property belonged to Pedell, who mortgaged it to Ball, who assigned to Hollinshead, who assigned to Ridgway. From this the defendants contend, that as Ridgway became the purchaser of the property at the sheriff's sale, he was the absolute owner of it, and, of course, had a right to dispose

2 A

[Hollinshead *v.* Allen.]

of it as he pleased, either by gift or sale, at a greater or less sum, as he might see fit.

"If the assignment of the mortgage had been an absolute assignment, this consequence would certainly follow. But inasmuch as the assignment was not absolute, but an assignment of a collateral security, I shall leave it to you to say whether, from the nature of the transaction and the evidence furnished by the books of Mr. Ridgway, there is not reason to believe, that the purchase was made for the benefit of Hollinshead; that Ridgway was a trustee for Hollinshead, and held the land, as he had the mortgage, as a collateral merely, to secure the debts owing to him; that the land, as between them, was but a substitute for the mortgage.

"If the transaction rested here, there could be nothing to which any person could take exception. For there can be no doubt, however indebted Hollinshead might be, he would have a right to assign securities for a much greater amount than $15,000 as collaterals, to secure the sum of $9403, then owing to Ridgway. This is conceded, and indeed could not be plausibly denied.

"In addition to the assignments of the mortgages and bond already mentioned, E. J. Hollinshead conveyed to Jacob Ridgway four tracts of land, in the state of New Jersey, three consisting of 100 acres, for the consideration of $100 each, and the fourth of 295 acres, for the consideration of $3000. These deeds are of the same date, viz., the 28th July, 1821. These deeds, although absolute in their form, the defendants admit were regarded by the parties as collateral, to secure the money owing to Mr. Ridgway, and future advances which he might be disposed to make.

"But the plaintiffs contend, that this was not at any rate the only design, but that the parties further intended to cover the property of Hollinshead, who at the time was largely indebted, and who at a short time afterwards took the benefit of the Act, from the grasp of creditors. If such was the design, of which you are the judges, it was fraudulent and void. No man has a right to hinder, delay, or defraud his honest creditors.

"The defendants, on the other hand, contend this was a fair, usual, and common transaction; that the design of the parties was nothing more nor less than to secure advances already made by Mr. Ridgway, and that might, thereafter, be made by him. If such was the intention, there was nothing wrong or exceptionable in it. The parties, it is true, exposed themselves to the risk of the property being levied or sold by a judgment creditor, either against the person holding the legal, or who is entitled to the equitable estate. But the transaction *per se* is not fraudulent; nor have the general creditors any right to complain, when it is in good faith for that purpose, and not as a cover to the property of the debtor.

"This is a question of fact, and depends on the intention of the

parties.  If you believe that the assignments and deeds mentioned were made to secure advances of money made, or to be made, that' I instruct you is lawful and fair; but if you should think, from a view of all the facts and circumstances in evidence, it was done with an intention to cover Hollinshead's property from his creditors, it is fraudulent and void.    This is a question of fact, on which it is not my intention to intimate an opinion.

"The remarks already made apply to the transaction, as between Messrs. Ridgway and Hollinshead, from the 25th July, 1826, until 24th September, 1834, when a new actor appears on the scene.    On that day, viz.: the 24th September, 1834, Ridgway, in whom the legal estate was vested, conveyed *to Sarah E. Hollinshead*, for the consideration of $1700, certain real estate therein described.    On the same day another tract of land in Cumberland county, in New Jersey, a tract of land of 295 acres, consideration $3000.    The 1st March, 1835, Jacob Ridgway also conveyed to Sarah E. Hollinshead the premises in dispute, consideration expressed in the deed $3500, viz., a mortgage for $1652, the residue of the purchase-money, in money arising from the sale of *sand*.    It is also in evidence, that on the 9th May, 1838, Sarah E. Hollinshead conveyed to her father in trust, for the purposes therein named, for her brother William and herself, all the property she received from the conveyance of Ridgway to her.

"The plaintiffs contend, that these deeds are only carrying out the fraudulent scheme between Ridgway and Hollinshead; that his daughter, and afterwards the father, were only subrogated in place of Ridgway for the same fraudulent purpose.    The plaintiffs insist, that at the time of the purchase and before, she was a single woman, dependent on her father and living with him, that she was destitute of means to make the purchase.    That the consideration mentioned in the deed, was nominal and fictitious, and not real.    They infer fraud from all the circumstances in evidence, which they say, prove that intent.    They further say, that fraud is manifest from her own declarations, as proved in the deposition of Anne McCarty, and the oath of Catherine Fitzgerald, who prove that Mrs. Whitaker, formerly Sarah E. Hollinshead, said in their presence, that the title was put in her name, merely to keep it from her father's creditors.    That he had labored hard for the property, and intended to have the benefit of it as long as he lived.    That it was shown he intended to keep it from his creditors.    That in pursuance of the plan and to carry it out, Sarah afterwards as they contend, viz., the 9th May, 1838, conveyed all the property conveyed to her, to her father, who continued to receive the rents, issues, and profits until his death.

"The defendants, however, deny anything like combination or fraud on her part.    They contend, she, Sarah, is a *bonâ fide*

purchaser for value, and without notice of any fraud or combination between Hollinshead and Ridgway, even if any existed, which they also deny. They also allege that witnesses have mistaken her expressions, and that no such conversation ever took place. They allege, that although single and unmarried at the time, she had ample means to make the purchase. That instead of being supported by her father, her father was supported with her money. That the consideration mentioned in the deed, viz.: the money justly owing to her from the sale of her sand, the product of her soil in the farm in Cumberland county, New Jersey, was not fictitious, colorable, or fraudulent, but was a just, true, and ample consideration.

"On this part of the case, viz.: the consideration, you will recollect that Edmund J. Hollinshead was entitled to a life estate in the Cumberland land, as tenant by the curtesy, and nothing more; Sarah E. Hollinshead in right of her mother, who died in 1814, was tenant in fee. The life estate being conveyed to Ridgway, he stands in Hollinshead's place; he is tenant for life, she is tenant in fee. Standing in this position, Ridgway being desirous to begin to dig sand from the soil, and to continue to dig it, it matters not much which, takes the advice of Mr. Ewing, at that time an eminent lawyer in the state of New Jersey. Afterwards, perhaps before he sells the sand, keeping, as I presume, an accurate account of the sales, amounting, as appears in evidence, to $18,316.47, which with interest added, increased to $23,697.39. I put it at this amount from the statement of counsel, without attempting to vouch for its accuracy. Of this you will judge. It appears that Hollinshead married his first wife, Miss Bower, Sarah's mother, in 1806, who had a son in 1808, who died in his minority; that Sarah was born in 1816. There is no proof the sand was worked before the birth of the son, when the tenancy by the curtesy commenced.

"Under these points I have been requested by the counsel for the defendants to instruct you, that this would be such waste, as under the statute of Gloucester, which is in force in New Jersey, would entitle Sarah to treble damages, and a forfeiture of the estate.

"The defendants contend that in an action of waste (if Sarah had been disposed to have brought it), she would have been entitled to recover the property wasted, and damages to the amount, at least, of the money realized by the sale of the sand. And the court would have been bound to treble the damages given by the jury. The effect would be this: the jury would have given, say $23,000, which the court would have been bound to treble, or, in other words, to give judgment for the sum of $41,750. I cannot so instruct you. I do not consider it such waste, although I agree

[Hollinshead *v.* Allen.]

it is technically waste, as comes within the operation of the statute of Gloucester, which in effect is highly penal.

" It is, however, a nice point, one not altogether free from difficulty; and if Mr. Ridgway, with a view to it, compromised her claim at $23,000, the amount of his receipts, with interest, it would be another instance of his sagacity and prudence.

" There was a time when any change whatever, although beneficial to the property, as, for instance, converting arable land into meadow, was held to be waste. But the law has never been so understood in this country. It may suit the condition of an old settled country like England, but it is inapplicable to us, where everything is in a state of transition and change. Such a rule would retard the improvement and settlement of a new country, where forests must be felled and mines opened.

" Can it be the law of this country, that where valuable mines are discovered, whether of coal, iron ore, valuable sand, gold, or silver, they cannot be touched by a tenant for life, without forfeiture of his interest, and subjecting himself to heavy damages, under the statute of Gloucester, which in its nature is a penal statute ?

" I charge you, gentlemen, that such is not the law, although, as I before said, it is a nice point, and would be the proper subject of compromise.

" But although this be so, the next inquiry is, is the tenant in fee without remedy ? or in other words, can the tenant for life pocket all the profits made by a sale of the soil itself, which is part of the inheritance, or is he obliged to account for the profits, to the owner of the fee ? On this point I have no difficulty. The tenant must account to the tenant in fee for all the profits made by the sale of the same.

" Apply this principle to the case in hand. Sarah E. Hollinshead had a just and legal claim on Mr. Ridgway for the whole amount received by him from the sale of the sand. Jacob Ridgway was indebted to her to that amount, which he was bound to pay her, either in cash, or as they might agree, by the conveyance of property, real or personal. That there was then a valuable consideration moving from Sarah E. Hollinshead to Ridgway, or to her father, or both, no person can doubt. It is in truth the payment of a just and honest debt, owing by Ridgway to her, which, instead of being paid in cash, the parties have preferred to have paid in land. She had nothing to do with the manner Ridgway chose to settle his account with her father. He had no right, without her permission, to pay her father's debts with her money. Sarah had an action against Ridgway, which she might have enforced either by bill in chancery, or by an action for money had and received for her use. As, then, she is a purchaser for valuable consideration, the next question you will have to de-

[Hollinshead *v*. Allen.]

cide is, is she a purchaser *bonâ fide* and in good faith, and without notice? The law is, she must not only be *bonâ fide* a purchaser for a valuable consideration, but a purchaser without notice. If she is, whatever may be the demands of Ridgway and her father, she is entitled to protection. She stands in a better, not in the same situation that they do, as she is a purchaser for a valuable consideration, and, of course, takes the property, notwithstanding there be a fraud in them. .

" On the question of fraud, the difference between the consideration paid for the land and its real value, has been much insisted on. If grossly inadequate, it would be a strong circumstance showing fraud. But if not gross, it is more or less so according to the inequality between the price paid and the value of the land. There is nothing, however, in the circumstances of this case, that would justify a verdict for the plaintiffs on that ground alone. On this subject the counsel widely differ. It will be for you to estimate the difference, and to give it such weight as you may think it justly entitled to.

" The question that you will have to decide will be, were Ridgway, and Hollinshead, and Sarah E. Hollinshead, engaged in a fraudulent combination to cheat and defraud the creditors of the latter.

" Fraud is not to be presumed on slight grounds. It must be proved, not by positive evidence, it is true, but by evidence which clearly indicates the dishonest and corrupt intent. When the evidence is of a measuring cast, your mind should incline in favor of innocence, particularly when the grave has closed over the accused, who are unable to defend themselves from the attacks of the living.

" In concluding my remarks on this point of the case, I must remind you, this cause has been before tried, and resulted in a verdict for the defendants. This is not binding on you, although it is considered as entitled to some weight, particularly in a doubtful case. It is also contended that the plaintiffs cannot recover, because Hollinshead took the benefit of the Act, and conveyed his property to trustees, for the benefit of his creditors. The objection would be fatal to the plaintiff's recovery, were it not for the fact, that the conveyance was made the 12th April, 1822, and we hear of no proceedings since that time. After such a lapse of time, the law presumes a reconveyance of the assignee's property, or that some arrangement has been made with the trustees, by which the property has been reinvested in the assignor. Under the circumstances, we think the assignment forms no obstacle in the way of the plaintiff's recovery.

" The question then on which the whole case stands, is a question of fraud, which you must determine. If you believe that Ridgway, Hollinshead, and Sarah E. Hollinshead were engaged in a fraudulent combination and conspiracy, to cheat the creditors

[Hollinshead *v.* Allen.]

of Hollinshead, by covering his property, you will find for the plaintiff. But unless you are satisfied of their guilt and the truth of the charge, your verdict should be in favor of the defendants.''

Verdict was rendered for the plaintiffs.

Judgment was rendered, and the case taken up on certificate to the *Nisi Prius.*

The assignments of error were as follows:—

The judge erred in admitting in evidence,

1. The deed of North, sheriff, to Jacob Ridgway.

2. The agreement, dated July 25, 1820, between Jacob Ridgway and E. J. Hollinshead.

3. The real estate book of Jacob Ridgway.

4. The deposition of Anne McCartney, and the parts objected to therein.

The judge erred in charging the jury:—

1. That the removal of the sand by Ridgway and Hollinshead was not waste under the statute of New Jersey, for which the parties, or either of them, would be liable to treble, or other damages.

2. That the insolvent discharge of E. J. Hollinshead was no bar to the plaintiff's recovery.

3. That under the evidence in the cause, the law would presume that the property had been reconveyed to, or was reinvested in the assignor.

The case was argued by *G. M. Wharton*, with whom were *Campbell* and *Williams*, for plaintiffs in error.

*C. Ingersoll*, with whom was *Lewis*, for defendants in error.

The opinion of the court was delivered January 26, 1852, by

LOWRIE, J.—It is a principle of law, of logic, of philosophy, and of common sense, that, in order to decide with accuracy upon the character of any phenomenon or transaction, we must know all the facts of which it consists, and all the circumstances that are truly connected with and influence it. In all investigations, physical and moral, which are guided by evidence or observation, the more carefully these facts and circumstances are collected and considered, the more certain are the conclusions. This is essentially what is, in short, called the rule of the *res gesta.* If we eliminate from the transaction any of the facts which tend to illustrate its character, we are guilty of the fallacy of non-observation, and endanger the accuracy of our induction.

Both these parties have given in evidence the titles which they have; and that of the defendants below must prevail, unless the plaintiff below prove that Jacob Ridgway, under whom the defendants claim, was the trustee of Edmund J. Hollinshead, under whom

the plaintiffs claim, and that defendants got title from Ridgway with knowledge of the trust. These facts, therefore, constitute the point of controversy, and the plaintiffs offer to prove them.

The plaintiffs aver that the whole connection of Jacob Ridgway with the property in controversy is the transaction (the *res gesta*) which proves the fact of the trust, and that, in order to decide the question which they raise, we must inquire how Ridgway got the property, how he held it, and how he disposed of it; and this view of the case, as a question of evidence, is undoubtedly correct.

It was therefore proper to regard as relevant evidence the agreement of 25th July, 1820, for that is the link that connects Ridgway with the transaction. That instrument placed him in the position of trustee as to certain claims of Hollinshead, and one of these claims gave him the means of purchasing at sheriff's sale the property in controversy and obtaining the conveyance from sheriff North, which must also be inspected as part of the transaction.

Having seen how he obtained the property, we must next inquire how he held it. Here his account book is directly in point, and most emphatically relevant. It contains the whole account of his proceedings under the agreement of 25th July, 1820, and in relation to other property subsequently conveyed to him by Hollinshead, including many entries relating to the property in controversy. Those entries are his own admissions concerning the character of the transaction.

Be it remarked that by that agreement Hollinshead had transferred to Ridgway, as collateral security, among other things, a mortgage on this property. Ridgway pursued the mortgage to execution, and in October, 1821, bought it himself, and got the deed for it in February, 1822, for the consideration of $1090. Of course, if he bought it for himself, we should expect him to credit Hollinshead with that amount, as so much collected for him, and to charge him with the expenses of collection. But if he bought it in for Hollinshead, we should expect to find Hollinshead charged with the expenses of the suit and not credited with the proceeds of sale; and this last is exactly what we do find. This, then, is his own admission that he bought the lot with Hollinshead's money and for his use. The same admission is often repeated by crediting Hollinshead with the rent and charging him with expenses of the property.

Besides the property contained in the agreement of July, 1820, we find that he obtained absolute deeds from Hollinshead for four other pieces of property on the 28th July, 1821, and yet there are many entries in the book showing that these too were held in trust for Hollinshead. This fact is also relevant on the subject of the trust, and, with the other facts and the proof that Hollinshead was largely in debt, tends to show that the agreement and

[Hollinshead *v.* Allen.]

conveyances were made to defraud creditors, though Ridgway may not have known it.

In 1834, Ridgway conveyed the property to Sarah, daughter of Hollinshead, and the next inquiry is, did she know that Ridgway held in trust for her father? Anne McCartney testifies to her admissions of knowledge. Are such admissions competent evidence?

We must here remark, that in 1838, Sarah conveyed this lot to her father to hold for her separate use, and that since that, she married Robert Whitaker. The admissions were made since her marriage. The question is, does her position as a married woman exclude her admissions in such a case as this?

Where there is any probability that a wife acts under the constraint of her husband, or in such a way as to enure to his benefit, we should be very guarded about receiving her admissions against herself. But where there can be no such suspicion, and her admissions are most palpably against her own interest and directly affecting her separate estate, I know of no principle of policy that would exclude them. In the case of McKee *v.* Jones, 6 *Penna. St. Rep.* 425, her admissions were received in just such a case as this; and it is impossible to see that the fact of the husband's presence in that case was an element essential to their competency, as against herself. It cannot be doubted that in an equity suit to establish the trust, she would be compelled to answer: Langley *v.* Fisher, 5 *Beav.* 477; Murphy *v.* Hubert, 16 *Penna. St. Rep.* 50.

Make these admissions as light as you will, they are not the only weights which the plaintiffs cast into the scale against the defendants. In Ridway's account-book all the sand is credited to the father; yet, when the land received from the father is conveyed back to the daughter, she gets credit in the deeds for the sand, and the money consideration named in the deeds and secured by mortgage from her, is exactly the amount necessary to balance the account between Ridgway and her father. Thus it appears that as soon as the father's account is settled, the land of the father is conveyed to the daughter, and he is a witness to the deeds. It is hard to believe that this was done without the consent of the father, and her knowledge of his title. Under such circumstances, her agreement that her half-brother, the son of her father, should have half the property, is a most suspicious liberality. I say nothing about his management of the property during all the time that Ridway held the title.

In one of the tracts of land, Hollinshead had only a curtesy estate through his first wife, the mother of Sarah, and this was conveyed to Ridgway. It was here that the sand was got, the proceeds of which Ridgway credited to the father. The plaintiffs in error insist that the learned judge erred in not charging the jury that, for this waste, Sarah was entitled to treble damages.

It is alleged that the importance of this point appears thus:—

[Hollinshead *v.* Allen.]

The whole consideration named in all the conveyances of Ridgway to Sarah, is exactly $27,000, part of it being a money consideration sufficient to balance her father's account with Ridgway, and the remainder, $23,697, being expressly said to be for the sand. On the other side it is alleged, that this is a totally insufficient consideration, and therefore further evidence of fraud. To meet this view of the case, the plaintiffs in error claim that Sarah was entitled to have the damage trebled, and to claim that much from Ridgway, and that that should be considered in estimating the real consideration paid by her for the land.

But it is entirely unnecessary to consider the point of law presented. It seems to be a forlorn hope, got up for a desperate emergency. One can hardly imagine a more ridiculous idea than that Sarah should make such a claim against the friend who had for years been digging out and patching together for her the broken fragments of her father's fortune. Had she attempted to drive such a bargain, she would have found that the lines were in Mr. Ridgway's hand. There is no evidence that she ever did make such a claim. By her own agreement, appearing in the consideration of the deeds, her claim was settled at $23,697, and she cannot now be allowed to show that she could possibly have made more of it, if she had been disposed to claim it. Surely there was no generosity in her not claiming it.

E. J. Hollinshead made an assignment as an insolvent in 1822, and it is insisted that that is an outstanding title that bars this recovery. But this is not so. Where an insolvent conceals property from his creditors, and then procures it to be conveyed to one advised of the fraud, such grantee cannot set up the insolvent assignment against a creditor who has pursued the land and bought it at sheriff's sale. If there be other creditors, they may be heard on proper terms.

Judgment affirmed.